**Block & Leviton LLP**
Lesley E. Weaver (SBN 191305)
lesley@blockesq.com
520 Third Street, Suite 108
Oakland, California 94607

Jeffrey C. Block (*pro hac vice* forthcoming)
jeff@blockesq.com
Jacob A. Walker (SBN 271217)
jake@blockesq.com
155 Federal Street, Suite 400
Boston, Massachusetts 02110
(617)398-5600

Attorneys for Plaintiff
Nicole Wertz

**United States District Court**
**Northern District of California**

| | |
|---|---|
| Nicole Wertz, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>Renaud Laplanche, Carrie Dolan, and LendingClub Corporation,<br><br>    Defendants. | Case No. _____<br><br>**Class Action Complaint for Violation of the Federal Securities Laws**<br><br>*Jury Trial Demanded* |

Plaintiff Nicole Wertz ("Plaintiff"), by and through her attorneys, alleges upon personal knowledge as to herself, and upon information and belief as to all other matters, based upon the investigation conducted by and through her attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## Summary of the Action

1. LendingClub Corporation ("LendingClub", "LC", or the "Company") billed itself as a totally new financial technology or "fintech" concept: it would act as a middleman and connect investors with capital (*i.e.*, lenders) to individuals and small businesses (*i.e.*, borrowers) who wanted to tap a line of credit to improve their homes and businesses or to refinance their debt. The company would collect a fee for servicing the loan and intermediating the connection between borrower and lender, but would take on no credit risk itself.

2. While investors bought into the company's image as a middleman, taking no underlying risk on the loans it was helping to facilitate, that carefully cultivated image was thrown into tatters by news that its Chairman and Chief Executive Officer, Renaud Laplanche, had abruptly resigned on May 9, 2016.

3. In the aftermath of the resignation, the Company's own disclosures and media reports made clear that LendingClub (along with Laplanche and John Mack, a LendingClub Board Member) had all invested in a fund, called Cirrix Capital, that itself invested in LendingClub loans on the LC platform. In other words, LC was not the neutral middleman it had promised investors; it had instead turned into just another bank, taking on credit risk (and falsely inflating demand for notes sold on its platform).

4. LendingClub shares sank on this news, dropping over 50% in one week and losing over $1.3 billion in market value.

**Jurisdiction and Venue**

5. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as the common law.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

7. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

9. In connection with the acts, omissions, conduct, and other wrongs described in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**Parties**

10. Plaintiff is an individual residing in Boulder, Colorado. Plaintiff purchased shares of the Company at artificially inflated prices during the Class Period (defined below) and has been damaged by the revelation of the Company's misrepresentations and omissions.

11. Defendant LendingClub Corporation ("LendingClub", "LC", or the "Company") is a Delaware corporation with its principal place of business in San Francisco, California. The Company trades on the New York Stock Exchange under the ticker symbol LC. The company describes itself in press releases as having the mission to "transform the banking system to make credit more affordable and investing more rewarding." It further claims that its technology platform enables it to "deliver innovative solutions to borrowers and lenders," and

"operate at a lower cost than traditional bank lending platforms, so [it is] able to pass the savings on to borrowers in the form of lower rates and to investors in the form of solid returns."

12. Defendant Renaud Laplanche ("Laplanche") was, until May 9, 2016, LendingClub's Chairman and Chief Executive Officer. Laplanche abruptly resigned from LendingClub following an internal review of certain transactions by LC's Board of Directors.

13. Defendant Carrie Dolan ("Dolan") is LendingClub's Chief Financial Officer and has been so since August 2010. Dolan purports to be responsible for LendingClub's "financial management, including accounting, financial planning and analysis, treasury, tax, fund accounting, trading and settlement, and investor relations."

14. Collectively, Laplanche and Dolan are referred to through this complaint as the "Individual Defendants," and with the Company as "Defendants".

15. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers, and investors (*i.e.*, the market). The Individual Defendants authorized the publication of the documents, presentations, and material alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## Substantive Allegations

16. LendingClub is a so-called "peer-to-peer" lender. As part of its registration statement, issued just prior to its initial public offering in December 2014, it purported to be the "world's largest online marketplace connecting borrowers and investors."

17. The registration statement further contended that LendingClub is "a technology-powered online marketplace [that] is a more efficient mechanism to allocate capital between borrowers and investors than the traditional banking system."

18. "Consumers and small business owners borrow through Lending Club to lower the cost of their credit and enjoy a better experience than traditional bank lending. Investors use Lending Club to earn attractive risk-adjusted returns from an asset class that gas generally been closed to many investors and only available on a limited basis to institutional investors."

***Defendants Repeatedly Insist That LendingClub Does Not Put Company Money at Risk***

19. In its December 8, 2014 S-1 Prospectus (Amendment 4), issued just days before its IPO, LC specifically stated "We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material."

20. This document was signed by the Individual Defendants.

21. A February 27, 2015 10-K filing signed by the Individual Defendants and issued by the Company repeated the same promise: "We do not assume credit risk or use our own capital to invest in loans facilitated be our marketplace, except in limited circumstances and in amounts that are not material."

22. In its May 5, 2015 10-Q, again signed by the Individual Defendants and issued by the Company, the same statement was made: "We do not assume credit risk or use our own capital to invest in loans facilitated by our marketplace, except in limited circumstances and in amounts that are not material."

23. That same filing reiterated the fact that LC was not investing in notes on its own platform: "The capital to invest in the loans enabled through our marketplace comes directly from investors."

24. These statements were repeated in a 10-Q on August 5, 2015 and a 10-Q filed on November 3, 2015, again signed by the Individual Defendants and issued by the Company.

25. In January 2016, Laplanche told a writer from Financial Times Alphaville blog that "[t]he representation we made to our equity investors is that we operate as a marketplace and that we don't take credit risk."

26. In a February 11, 2016 call with analysts, Laplanche stated "in contrast to traditional banks and other balance sheet lenders, in our model capital to investment loans is provided from loan sales and securities issued to investors rather than from equity deposits or borrowed fund. As a result we do not assume credit risk and the loan sales and securities issued to investors math the balances, interest rates and maturities as the loans issued to borrowers." Later in that call, he stated "We have no intention as a matter of business model to start up investing our balance sheet and then take balance sheet risk in our loans."

27. These repeated assurances made it clear to investors: an investment in LendingClub was an investment in the Company's technology platform. It was not an investment in the underlying loans offered on the LendingClub platform. In other words, LC was promised as a new kind of "fintech" middleman, not a traditional risk-taking bank.

### *LendingClub Also Insists That It Has Strong Internal Controls in Place*

28. The Individual Defendants also attested to the validity LC's internal controls. A 10-K filed on February 27, 2015 stated:

> Our management, including the Chief Executive Officer and Chief Financial Officer, has assessed the effectiveness of our internal control over financial reporting as of December 31, 2014, following the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 1992 Internal Control—Integrated Framework

29. And the Company's February 22, 2016 10-K stated:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management conducted an evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2015, based on the criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. As a result of this assessment, management concluded that, as of December 31, 2015, our internal control over financial reporting was effective in providing

reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

### The Truth Is Revealed When Laplanche Abruptly Resigns

30. On May 9, 2016, the Company announced that Laplanche had resigned, effective immediately, following an internal review:

> Lending Club conducted a review, under the supervision of a sub-committee of the board of directors and with the assistance of independent outside counsel and other advisors, regarding non-conforming sales to a single, accredited institutional investor of $22 million of near-prime loans ($15 million in March and $7 million in April). The loans in question failed to conform to the investor's express instructions as to a non-credit and non-pricing element. Certain personnel apparently were aware that the sale did not meet the investor's criteria.
>
> In early April 2016, Lending Club repurchased these loans at par and subsequently resold them at par to another investor. As a result of the repurchase, as of March 31, 2016, these loans were recorded as secured borrowings on the Company's balance sheet and were also recorded at fair value. The financial impact of this reporting is that the Company was unable to recognize approximately $150,000 in revenue as of March 31, 2016, related to gains on sales of these loans.
>
> The review began with discovery of a change in the application dates for $3.0 million of the loans described above, which was promptly remediated. The board also hired an outside expert firm to review all other loans facilitated in the first quarter of 2016 and the firm did not find changes to data in these or other Q1 loans.
>
> The review further discovered another matter unrelated to the sale of the loans, involving a failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an investment in the same fund. This lack of disclosure had no impact on financial results for the first quarter.
>
> Given the events above, the Company took, and will continue to take, remediation steps to resolve the material weaknesses in internal control over financial reporting identified in the first quarter of 2016 -- one related to the sales of non-conforming loans and the other to the failure to disclose the personal investment interests -- and to restore the effectiveness of its disclosure controls and procedures. These remediation steps included the termination or resignation of three senior managers involved in the sales of the $22 million of near-prime loans.

> Lending Club will file an extension request with the Securities and Exchange Commission to file its quarterly report on Form 10-Q for the first quarter on or prior to May 16, 2016.

31. In other words, there were two reasons for Laplanche's sudden departure: *First*, LendingClub had sold loans to an institutional investor that did not meet that investor's standards, a violation of LC's supposed internal controls. *Second*, Laplanche had failed to disclose to LC directors that he had a stake in a fund, called Cirrix Capital, which itself purchased loans on the LC platform.

32. After the abrupt departure of Laplanche, news outlets, including the New York Times, Bloomberg, the Wall Street Journal and the Financial Times began reporting on LC's links to Cirrix Capital.

33. Indeed, Bloomberg News reported on May 9, 2016 that LC itself had invested in Cirrix Capital, and owned a 15% interest in the fund. In addition, Laplanche and LC board member John Mack both had individual investments in Cirrix Capital.

34. Combined, the Company, Laplanche, and Mack own at least 31% of Cirrix, according to Bloomberg News. And Cirrix has reportedly invested over $175 million into notes sold on the LC platform.

35. The fact that LC owns an interest in Cirrix Capital, which in turn used LC's funds to invest money on the LC platform directly contradicts the very premise of LendingClub and the promises the Company made from the time of its initial public offering. Through Cirrix, LC was investing LC money on the loans sold on LC's own platform. It was taking on credit risk.

36. In other words, following the news about the departure of Laplanche, it became clear to investors and the market that an investment in LC was no longer just an investment in the company's technology platform and role as a middleman. It was instead, in part, an investment in the underlying loans being sold on that platform.

37. As the Financial Times put it, this was a total betrayal of LC investors:

> . . . [S]uch an investment [in Cirrix] contradicts the core proposition of Lending Club, as per Laplanche's comments in January. The business is supposed to be a pure marketplace, which

takes no risk on to its balance sheet and merely sells loans through to retail and institutional buyers. We now discover that the business does indeed have direct exposure to some of the loans that it makes. Lending Club spokesperson Steve Swasey didn't reply to emailed questions about why Lending Club made the investment, or if there were any other investments in similar funds.

38. The Financial Times continued:

So by April this year, Lending Club, its chief executive, and a board member together had a 31 per cent stake in an entity that effectively bought some $175m of Lending Club loans in 2015, according to the filing last month. This is the sort of blatant conflict of interest that makes you wonder if there was something in the company's water cooler.

39. The Financial Times explains well why LC shares dropped so precipitously upon the disclosure of this news:

The bigger question is what kind of company is Lending Club after all of this. **It's apparently not so wedded to the idea of being a pure marketplace, so it's just another nonbank lender with ethical lapses, an unstable funding base and a reliance on direct mail marketing to drive customer acquisition.** Somewhat of a less exciting dream than the one sold when the company floated at $15 in December 2014.

40. Investors were shocked by these revelations. LC stock closed at $7.10 per share on May 6, 2016 (the last trading day before the news was revealed), then fell to a low of $4.54 on May 9, 2016, ultimately closing at $3.51 on May 13, 2016. This over 50% drop represents a loss of over $1.3 billion in market value.

## Class Action Allegations

41. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired LendingClub common stock between December 11, 2014 and May 9, 2016, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

42. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

43. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether the Exchange Act was violated by Defendants;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of the Company's stock was artificially inflated; and

    f. The extent of damage sustained by Class members and the appropriate measure of damages.

44. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

45. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

46. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Fraud on the Market**

47. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

48. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

### No Safe Harbor

49. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

50. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**Loss Causation**

51.     On May 9, 2016, the Company disclosed the resignation of its Chief Executive, Laplanche, and the market further learned that the Laplanche, Mack, and the Company all invested in a fund that itself invested on the LC platform, contrary to its public statements made beginning in December 2014 and further described above. At market close on Friday, May 6, 2016, LC stock traded at $7.10 per share. LC shares closed at $4.62 on Monday, May 9, 2016 (representing a 35% drop from Friday's close), and continued their decline throughout the week as the market learned more about LC's false and misleading statements. LC stock closed at $3.51 per share on Friday, May 15, 2016. This represented a total one week drop in value of over 50%, wiping out over $1.3 billion in market value. This decline is directly attributable to the May 9, 2016 corrective press release and the additional details about LC's activities described above and reported throughout the week of May 9, 2016.

52.     The chart below, published in the Wall Street Journal, shows the extent of the decline:



**Steep Slide**
LendingClub's daily share price since IPO

IPO price $15
Monday $3.94

Source: WSJ Market Data Group
THE WALL STREET JOURNAL.

**Causes of Action**

**Count 1**
**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

53. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

56. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count 2**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the press releases, presentations, interviews, and quarterly and annual reports where false statements were made both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**Prayer for Relief**

Wherefore, Plaintiff prays for relief and judgment as follows:

a. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

b. awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

c. awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d. awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**Demand for Jury Trial**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

| | |
|---|---|
| May 18, 2016 | Respectfully submitted, |
| | /s/ Lesley E. Weaver |
| | Lesley E. Weaver (SBN 191305) |
| | Jeffrey C. Block (*pro hac vice* forthcoming) |
| | Jacob A. Walker (SBN 271217) |
| | |
| | **Block & Leviton LLP** |
| | 520 Third Street, Suite 108 |
| | Oakland, California 94607 |
| | 155 Federal Street, Suite 400 |
| | Boston, MA 02110 |
| | (617)398-5600 |
| | |
| | lesley@blockesq.com |
| | jeff@blockesq.com |
| | jake@blockesq.com |
| | *Attorneys for Plaintiff* |